IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| AARON L. SAMPSON,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>INTEGRA TELECOM HOLDINGS, INC.,<br>d/b/a INTEGRA TELECOM, and INTEGRA<br>TELECOM OF UTAH, INC.,<br><br>　　　　　　Defendants. | **MEMORANDUM DECISION<br>AND ORDER**<br><br><br>Case No. 2:09-cv-120 CW |

Plaintiff Aaron Sampson brings this action against Integra Telecom, Holdings, Inc. and Integra Telecom of Utah, Inc. (together, "Integra"), his former employer. Mr. Sampson alleges that Integra terminated him because of his race and in retaliation for his complaints about racial harassment, both in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"), and the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"). Integra has moved for summary judgment on both claims.

Because the court concludes that no reasonable jury could find an inference of racial discrimination in Integra's decision to terminate Mr. Sampson, the court grants summary judgment in favor of Integra on his discrimination claim. The court also grants summary judgment in Integra's favor on Mr. Sampson's retaliation claim because no reasonable jury could conclude that Integra had a retaliatory motive. In the alternative, the court believes that Mr. Sampson's complaints were not directed at activity within the scope of Title VII, and that Mr. Sampson's belief otherwise was not reasonable.

## FACTS

In November 2006, Mr. Sampson was hired as an account executive by Eschelon Telecom, Inc. Eschelon was a telecommunications service provider of voice and data services to small and medium sized businesses. Mr. Sampson worked in Eschelon's Salt Lake City, Utah office. Mr. Sampson's job required him to develop new customers for Eschelon and to sell Access Line Equivalents. The term "Access Line Equivalent" or "ALE" refers to a phone line, DSL line, or a channel on a T-1 line sold by Eschelon.

## I. Mr. Sampson's Experiences at Eschelon

During Mr. Sampson's employment at Eschelon, Mr. Sampson was subjected to racially derogatory comments and jokes by his co-workers and supervisors. None of these incidents occurred while Mr. Sampson was employed with Integra. The court will nevertheless describe them in detail to give context to this case.

In February 2007, Rico Pabon, one of Mr. Sampson's co-workers, introduced Mr. Sampson during a sales meeting by saying, "take it away Buckwheat." Mr. Sampson states that some attendees of the meeting laughed at the comment, including Lee Ziebarth, a sales manager who did not supervise Mr. Sampson. Mr. Sampson told Mr. Pabon that he was offended by the comment, and Mr. Pabon eventually apologized. Mr. Sampson accepted the apology. After the meeting, Mr. Sampson met with Mr. Ziebarth. Mr. Sampson asked Mr. Ziebarth to report the comment to human resources ("HR"). Mr. Ziebarth did not immediately report it to HR and Mr. Sampson eventually reported it himself.[1] Mr. Pabon did not call Mr. Sampson "Buckwheat"

---

[1] Mr. Sampson also states that Mr. Ziebarth sometimes greeted him by saying "hey boys," which Mr. Sampson perceived as a subtly derogatory term toward African Americans.

again because Mr. Pabon was terminated for reasons unrelated to the comment.

Mr. Sampson states that he continued to hear unidentified people say "Buckwheat" around the office at Eschelon after the incident with Mr. Pabon. Mr. Sampson told Vicki Symanietz of Eschelon's HR department, and his immediate supervisor, Dave Jorgenson about people saying "Buckwheat," but acknowledged that he could not tell them who had said it. Mr. Sampson was not completely satisfied with the way Mr. Pabon's comments were handled. Mr. Sampson suggested that he would have liked to see the whole company receive diversity training.

In May 2007, Matt Whipple, a co-worker, told Mr. Sampson a racially charged story. Mr. Whipple told Mr. Sampson that he walked into a bar in Wyoming. Mr. Whipple said that a man at the bar asked him if he was a skinhead and Mr. Whipple replied, "Why, do you want to go out and kill some Niggers and Spicks?" (Sampson Depo. 107:16–17.) Mr. Sampson told Mr. Whipple that he was offended by his comment and he wanted an apology. Mr. Whipple did not apologize at that time.

Mr. Whipple self-reported the incident to a training supervisor, Dwayne Lazarre. Mr. Lazarre admonished Mr. Whipple that his comments were "inappropriate" and "out of line," and that Mr. Whipple owed Mr. Sampson an apology. Mr. Whipple also self-reported the incident to his manger, Mr. Jorgenson. Mr. Sampson states when he spoke to Mr. Jorgenson, Mr. Jorgenson told him, "after speaking with [Mr. Whipple], it's my understanding that he was not calling you the 'N-word,'" and "he has a right to express his opinion in the workplace." (Sampson Depo. at 111.) Mr. Sampson told Mr. Jorgenson that he was surprised and offended by his response, and that he wanted Mr. Jorgenson to handle Mr. Whipple's comments according to company policy. Mr. Jorgenson asked Mr. Sampson if he would like an apology and Mr. Sampson said that

"would be the least [Mr. Whipple] could do." (*Id.* at 112.) Mr. Jorgenson set up a meeting with Mr. Sampson and Mr. Whipple and Mr. Jorgenson had instructed Mr. Whipple to give an apology. In Mr. Sampson's opinion, Mr. Whipple's comments at that meeting did not amount to an apology.

Mr. Sampson followed up with Mr. Jorgenson about his concern with Mr. Whipple because he was not satisfied with the way Mr. Jorgenson or HR had handled it. At that time, Mr. Sampson also complained about Mr. Whipple using profanity at sales meetings. In June 2007, Mr. Jorgenson reported the incident involving Mr. Whipple's story to Eschelon's HR department.

Ms. Symanietz investigated the incidents involving Mr. Pabon and Mr. Whipple. Ms. Symanietz determined that Mr. Pabon had been terminated from Eschelon so there was no action to be taken with him. As to Mr. Whipple's comment, Ms. Symanietz decided that Mr. Jorgenson had sufficiently addressed the issue by reprimanding Mr. Whipple. Mr. Sampson acknowledged that Mr. Whipple had not made any further inappropriate comments. Ms. Symanietz investigated the work atmosphere and did not find what she believed was evidence of a hostile work environment or continuing inappropriate racial comments. She concluded that the two prior comments by Mr. Pabon and Mr. Whipple were isolated incidents.

## II.    Mr. Sampson's Performance at Eschelon

Eschelon's general practice was to provide new account executives with a six-month training and "ramp up period" during which their sales quota was 30 ALEs each month. The expectation was that after six months, the account executive would become a communications specialist and his or her monthly quota would increase to 60 ALEs. Accordingly, when Mr. Sampson began as an account executive with Eschelon in November 2006, his sales quota during

his six-month training period was 30 ALEs per month.  Mr. Jorgenson, Mr. Sampson's sales

manger at Eschelon from November 2006 until September 1, 2007 stated that because Mr.

Sampson was having difficulty meeting his reduced monthly quota during his six-month training

period, he decided to keep Mr. Sampson's ALE quota at 30 ALEs per month rather than

increasing his quota to 60 ALEs per month.  Mr. Sampson did not achieve the reduced quota of

30 ALEs for the duration of his employment with Eschelon.

In June 2007, Mr. Jorgenson and Ms. Symanietz spoke about Mr. Sampson's declining

performance.  Mr. Sampson made 17 sales in May 2007 and did not make any sales in the month

of June 2007.  Ms. Symanietz reviewed Mr. Sampson's performance numbers and compared his

numbers to other communications specialists in Mr. Sampson's department.  Ms. Symanietz

states that Mr. Jorgenson had placed other employees on his team who were not in Mr.

Sampson's protected class on performance improvement plans, or "PIPs," for failing to reach

their sales quotas.  On July 3, 2007, Mr. Jorgenson and Ms. Symanietz met with Mr. Sampson to

place him on a PIP.

Under the PIP, Mr. Sampson was required over a three-month period to reach 70% of his

three-month total ALE quota.  Mr. Sampson's three-month quota was 90 ALEs (30 ALEs per

month), so he was required to sell 63 ALEs over the three-month period.  Although the PIP

period was July 1 through August 31, Mr. Sampson could be removed from the PIP at the end of

July if he achieved 70% of his three-month ALE quota for the rolling three-month period.  Mr.

Sampson was also expected to attend 5 sales meetings with his manager and to submit 15

business proposals.

Mr. Sampson did not meet his PIP quota in July.  He sold ten ALEs for the month.  He

also failed to meet the other requirements in his PIP, for example submitting only nine proposals

(rather than the minimum expectation of 15) and attending no meetings with his manager. After Mr. Sampson failed to meet his requirements set forth in the first month of his PIP, the PIP extended through the end of August 2007.

On August 6, 2007, Ms. Symanietz and Mr. Jorgenson met with Mr. Sampson to discuss the continued requirements for the PIP. The PIP provided that Mr. Sampson would be removed from the PIP if his three-month average reached 70% of his three-month quota, which meant that he had to sell 53 ALEs in August to reach a total of 63 ALEs (70% of 90) for the three-month period. In addition, Mr. Sampson was required to invite his manager to a minimum of five appointments during the month, set two appointments each day, and submit accounts of daily activity to his manager. The PIP stated that if Mr. Sampson failed to meet 70% of his quota, he would be terminated.

On August 22, 2007, Ms. Symanietz e-mailed Mr. Jorgenson to ask whether Mr. Sampson was meeting his performance goals. Mr. Jorgenson responded that Mr. Sampson had sold only two ALEs and had invited him to two meetings.

## III.    Mr. Sampson's Experiences at Integra

Integra acquired Eschelon on August 31, 2007 and merged its operations with Eschelon soon after that. Gary Nieboer, senior vice president of Integra, stated that in the acquisition, Integra would not necessarily be able to retain all employees from Eschelon. Mr. Nieboer stated that prior to the acquisition, Integra had analyzed the sales representatives and their sales performance for a prior number of months to determine who would remain at Integra or who would be let go. Integra decided to terminate several of the lower performing employees, including Mr. Sampson.

As the merger date approached, however, a number of people voluntarily left their jobs,

which opened up positions. Integra, therefore, decided to offer Mr. Sampson a position in the merged company. Mr. Nieboer stated that because Mr. Sampson's sales performance at Eschelon was not optimal, Integra gave him an option of staying on at Integra, but that once there, he would need to improve his performance or take a severance.

Chris Arambula was vice president of sales at Integra and one of Mr. Sampson's supervisors. On September 4, 2007, Mr. Arambula and Mr. Nieboer met with Mr. Sampson to offer him an account executive position at Integra. Account executive was a sales position comparable to Mr. Sampson's former position at Eschelon. In accepting the position, Mr. Sampson received an increase in the base salary he had gotten at Eschelon to bring him in line with Integra's account executives. The minimum monthly sales quota for account executives at Integra was 70 ALEs. Mr. Sampson recalls that Mr. Nieboer and Mr. Arambula explained that they were continuing the PIP from Eschelon and he needed to hit 70 ALEs in the next 30 days or his job would be eliminated.

In this initial September meeting with Mr. Nieboer and Mr. Arambula, Mr. Sampson raised his complaints about the incidents at Eschelon. Mr. Nieboer and Mr. Arambula informed Mr. Sampson that they take those "types of things" (Nieboer Depo. at 11:17–21) very seriously. Mr. Nieboer immediately followed up with Integra's HR and asked them to contact Mr. Sampson to address his concerns.

Jackie Zamora of Integra HR spoke with Mr. Sampson regarding the incidents that had happened at Eschelon. Mr. Sampson told Ms. Zamora that he wanted her to investigate his prior complaints because he did not think they were appropriately investigated by Eschelon HR. Ms. Zamora states that Mr. Sampson relayed the incident where Mr. Pabon called him "Buckwheat." Ms. Zamora contacted Ms. Symanietz about Mr. Sampson's complaints. Ms. Symanietz told her

Eschelon's HR department had acted on Mr. Sampson's complaints. Ms. Zamora told Mr. Sampson that Integra did not tolerate harassment or discrimination and told him to come to her with any additional concerns.

At Integra, Mr. Sampson's manager immediately following the merger was Matt Reed. Mr. Reed left Integra in October 2007. After Mr. Reed left, Mr. Arambula acted as Mr. Sampson's manager until Mr. Lazarre became Mr. Sampson's direct manager in late November 2007. Mr. Jorgenson was no longer Mr. Sampson's manager and, while Mr. Jorgenson continued to be employed by Integra, he was transferred out of the Salt Lake City office soon after the merger.

While at Integra, Mr. Sampson continued to make complaints to HR and management about his belief that his past complaints at Eschelon were not handled appropriately by management or Eschelon HR. Mr. Sampson also complained that he was mistreated by the sales engineers at Integra and other Integra employees. Specifically, Mr. Sampson alleges that he caught one employee going through his files and suspected that the employee had taken some of them. Mr. Sampson also complained that another employee ignored him when he was trying to turn in an order, and threw the order on the ground. Mr. Sampson further reported that the sales engineers would ignore him when he would speak to them. Finally, he related that someone continued to say "Buckwheat" within his earshot, but he was not sure who was doing so.

During Mr. Sampson's time at Integra, Kim Severson joined Integra as the new HR representative for Salt Lake City. When she did so, she requested a meeting with Mr. Sampson about his complaints. Mr. Sampson cannot recall the exact details of his conversation with Ms. Severson, but he generally recalls that they talked about all of his complaints from the start of his employment with Eschelon to his continuing employment at Integra. Mr. Sampson has no

specific memory, however, of whether he brought up the specific complaints that he had during his time with Integra. Mr. Sampson stated that Ms. Severson told him that she looked into his complaints about Eschelon and that she found that his complaints had been handled appropriately. Mr. Sampson stated that Ms. Severson said there was not going to be any further investigation.

After his meeting with Ms. Severson, Mr. Sampson told Mr. Arambula that he did not feel that Ms. Severson was handling his complaints appropriately. Mr. Sampson states that at this meeting with Mr. Arambula, Mr. Sampson brought up the complaints about his time at Eschelon. He also mentioned that he still heard "Buckwheat" around the office on occasion, but that he did not know who was saying it. Mr. Sampson states that Mr. Arambula's response was: "Well, I'm disappointed to hear that. I will look into your concerns and make sure they will be handled appropriately. Your complaints are not going to be tolerated." (Sampson Depo. at 276:1–14.) Mr. Sampson states that Mr. Arambula also said to him at this time that, "your performance is not where it needs to be and things are not going to work out here." (*Id.* at 284:15–18.)

Although Mr. Sampson was expected to sell 70 ALEs by September 30, Mr. Sampson sold no ALEs in September. According to Mr. Sampson, the merger interfered with his ability to sell ALEs. Integra did not terminate Mr. Sampson at that time. Mr. Sampson sold 42 ALEs in October, and 6 ALEs in November. On December 4, 2007, Mr. Arambula and Ms. Severson met with Mr. Sampson to place him on a final PIP.

At that meeting, Mr. Sampson was placed on a PIP under which he was required to sell 36 ALEs by December 14 and a total of 70 ALEs by December 31. In addition, the PIP required that Mr. Sampson make 50 customer prospecting calls each day, set three new appointments per

day and attend three appointments each day, and generate five written business proposals per month.  If he did not meet those goals, he would face disciplinary action, up to and including the termination of his employment.

Mr. Sampson met the mid-month requirement to sell 36 ALEs by December 14.  By the end of December, however, he had only sold a total of 55 ALEs, thus falling short of the required 70 ALEs by December 31, 2007.[2]  Integra terminated Mr. Sampson's employment effective December 31, 2007.

Mr. Sampson filed this action on February 10, 2009.  In his four count complaint, Mr. Sampson asserts that (1) Integra terminated his employment based on his race and (2) terminated him in retaliation for having voiced opposition to practices that he reasonably believed to be unlawful, in violation of both Title VII and Section 1981.  Integra has moved for summary judgment on all four counts, which are based on these two claims.

## ANALYSIS

### I.  LEGAL STANDARD

"Summary judgment is appropriate if the moving party demonstrates that 'there is no genuine issue as to any material fact' and that it 'is entitled to judgment as a matter of law.'"  *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 944 (10th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)).[3]  An issue is "genuine" if "there is sufficient evidence on each side so that a

---

[2] While Mr. Sampson has intimated that Integra may have improperly credited him with too few ALEs, he has not pointed to any clear evidence that Intgra did so.  Rather Mr. Sampson appears to simply disagree with Integra's method of counting ALEs.  Such an assertion does not reasonably raise an inference of any impropriety by Integra in crediting him with ALEs.

[3] The court notes that the recent changes to Rule 56 that slightly alter the wording of the rule do not change the analysis or outcome here.

rational trier of fact could resolve the issue either way." *Thom v. Bristol-Myers Squibb Co.*, 353

F.3d 848, 851 (10th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)).  A fact is "material" if, under the applicable substantive law, it is "essential to the

proper disposition of the claim." *Thom*, 353 F.3d at 851 (citing *Anderson*, 477 U.S. at 248).

Summary judgment must be entered "'against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case and on which that party will

bear the burden of proof at trial.'" *Thom*, 353 F.3d at 851 *(*quoting *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986)).  The court views the evidence in the light most favorable to the non-

moving party, and "all justifiable inferences are to be drawn in the [nonmovant's favor]."

*Anderson*, 477 U.S. at 255.

## II.    TERMINATION BASED ON RACE

Mr. Sampson claims that Integra terminated him based on his race in violation of Title

VII and 42 U.S.C. § 1981.[4]  To satisfy his burden in his claim of termination of employment, Mr.

Sampson must show that "(1) he was a member of a protected class; (2) he was qualified and

satisfactorily performing his job; and (3) he was terminated under circumstances giving rise to

an inference of discrimination." *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir.

2004) (citation omitted).  Integra asserts that Mr. Sampson has not shown undisputed facts

establishing the second and third elements.

When, as here, a race discrimination case depends on circumstantial evidence of

discriminatory intent in termination rather than direct evidence, the Tenth Circuit applies the

---

[4] The analysis for discrimination claims under Title VII and Section 1981 is the same.  *See Carney v. City and County of Denver*, 534 F.3d 1269, 1273 (2008).  Accordingly, Mr. Sampson's termination and retaliation claims may be treated as two counts, though the complaint brings them as four.

familiar burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Sanders v. Southwestern Bell Telephone, L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008)*, cert. denied,* 130 S. Ct. 69 (2009)*.* Under the *McDonnell Douglas* analysis, a plaintiff bears the initial burden of setting forth a *prima facie* case of discrimination. *See Sanders*, 544 F.3d at 1105. After the plaintiff makes a *prima facie* case, the burden shifts to the employer to give a legitimate, nondiscriminatory reason for its employment decision. *Id.* If the defendant articulates a legitimate, nondiscriminatory reason for the plaintiff's termination, the plaintiff must offer evidence to show that the defendant's reason is pretext for discrimination, thus creating a genuine issue of material fact. *Id.* A plaintiff can satisfy this burden by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." *Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir. 2000).

The court will first address whether Mr. Sampson's experiences at Eschelon and Eschelon's responses are relevant to his discrimination claim against Integra. Second, the court will address whether there is an inference of discrimination. Finally, the court will address Integra's nondiscriminatory reason for Mr. Sampson's termination and whether Mr. Sampson has produced evidence that it was pretextual.

### A. Mr. Sampson's Experiences at Eschelon are Irrelevant to Mr. Sampson's Discrimination Claim Against Integra.

Mr. Sampson argues that while he reported to all new management at Integra, his experiences at Eschelon can properly be considered in his discrimination claim against Integra. In support, Mr. Sampson asserts that his supervisor at Integra, Mr. Arambula, acted as a

"conduit" for Mr. Jorgenson, who Mr. Sampson asserts placed him on a PIP either because of racial bias or in retaliation for complaining. Mr. Sampson claims that Integra made the decision to terminate him based on the information that Mr. Arambula received from Mr. Jorgenson about Mr. Sampson's performance at Eschelon. Mr. Sampson further contends that Integra did not conduct an independent investigation of that recommendation.

Mr. Sampson's posited theory of liability is often referred to as "cat's paw" or "rubber stamp." These are claims under Title VII in which a plaintiff shows that the bias of a subordinate, who lacks decision making power, decisively affects the actions of a decision maker. *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006). To prevail on such a claim, a plaintiff must establish that the biased subordinate had more than mere "influence" or "input" in the decision making process. *Id.* at 487. Rather, the plaintiff must demonstrate that the actions of the biased subordinate—reports, recommendations, or other actions—caused the adverse employment action. *Id.*

An employer can avoid subordinate bias liability by conducting its own independent investigation of the allegations against an employee and not relying exclusively on the word of a biased subordinate. *Id.* (citing *English v. Colorado Dep't of Corrs.*, 248 F.3d 1002, 1011 (10th Cir. 2001). Such an independent investigation defeats the causal connection between the subordinate's actions and the employment decision. *E.E.O.C.,* 450 F.3d 488. The investigation need not necessarily be formal or exhaustive: simply asking an employee for his version of events may defeat the causal inference. *Id.* (citing *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231-32 (10th Cir. 2000).

Mr. Sampson states that during his time at Eschelon, Mr. Jorgenson had displayed a desire to drive him out of the company. Mr. Sampson maintains that Mr. Jorgenson had

communicated unwarranted criticisms to HR in an effort to drive out Mr. Sampson. Though Mr. Jorgenson may have had some animus towards Mr. Sampson, Mr. Sampson has not offered any evidence that Mr. Jorgenson's actions were racially motivated or that his dislike of Mr. Sampson was because of Mr. Sampson's race. That lack of proof alone precludes Mr. Sampson's argument. Even assuming, however, for the sake of argument, that Mr. Jorgenson was so motivated, Mr. Sampson's theory still fails.

Under the "cat's paw" theory, one way Mr. Jorgenson could have "caused" the adverse employment action was by discussing Mr. Sampson's sales numbers with Mr. Arambula in August 2007. After this contact with Mr. Jorgenson, however, Mr. Arambula proceeded to hire Mr. Sampson and conduct his own independent assessment of Mr. Sampson's sales performance for the next four months. Moreover, Integra undertook an independent investigation into the issues Mr. Sampson complained about and had numerous conversations with Mr. Sampson where they asked him for his version of the events without simply relying on any negative reports they may have received from Mr. Jorgenson.

Mr. Sampson also argues that Mr. Jorgenson's PIP, which Integra continued, was a factor in Mr. Sampson's termination. But Mr. Sampson was not terminated by Integra in the first month of his employment. Rather, he was terminated several months afterward, after falling short of each PIP Integra placed him on. Any effect of Mr. Jorgenson's PIP was indirect and remote in time to his termination. Accordingly, the "cat's paw" theory does not apply because Mr. Sampson has not shown any causal connection between Mr. Jorgenson's asserted influence at the time of the merger and his firing quite some time later.

### B. Mr. Sampson Has Not Shown an Inference of Race Discrimination.

In addition to the "cat's paw" theory, Mr. Sampson asserts that he has established his

*prima facie* case of discrimination with evidence that he argues shows that he was treated worse than others similarly situated who were not in his protected class. Such a "disparate treatment" showing is one accepted way to meet the *prima facie* case of race discrimination. *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800-01 (10th Cir. 2007). In particular, Mr. Sampson maintains that he was treated differently because other employees not in his protected class also failed to meet Integra's quota but were not terminated at the same time as Mr. Sampson.

Mr. Sampson's disparate treatment argument fails because he has not offered facts supporting the conclusion that he was similarly situated to the employees to whom he compares himself. "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006).

Mr. Sampson has failed to show he was similar to other employees both on a specific and general level. In terms of a specific level, at the time of the merger, Mr. Sampson had the lowest number of ALE sales of the Eschelon employees who were being hired by Integra. He was the only former Eschelon employee on a PIP, and he had sold only 12 ALEs during the prior three months. Once at Integra, Mr. Sampson was informed that the PIP from Eschelon would be continued and he would have to sell a minimum of 70 ALEs per month to remain employed. Mr. Sampson has not shown that any other Integra employee was in this particular situation or a similar situation.

Mr. Sampson has failed to show similarity on a general level as well. Of the Eschelon employees supervised by Mr. Jorgenson, only Mr. Sampson, SM and MW continued their employment with Integra. It thus appears at first blush that SM and MW were similarly situated to Mr. Sampson. But SM and MW had a quota of 60 ALEs per month, not 30, and thus were

held to higher performance expectations than Mr. Sampson.[5]  As for the Integra employees against whom Mr. Sampson compares himself, Mr. Sampson has not offered evidence supporting a conclusion that they were similarly situated.  To wit, he has not made any showing that they had the same supervisors; that they had similar lengths of employment; that their performance histories were comparable to his; or that the standards governing their performance was similar to the standards governing his.  To the contrary, individuals who had already been working at Integra at the time Mr. Sampson was first hired were in a different category, having already established themselves to some extent at Integra while Mr. Sampson was just starting.  Therefore, there is no basis upon which to form a reasonable conclusion that any of those employees can be considered to be similarly situated to Mr. Sampson.  Accordingly, even if other Integra employees had similar sales figures to Mr. Sampson, he has not met his burden of showing that he can legitimately compare himself to them in terms of the employment decisions Integra made about them.

In any event, Integra has shown that there were various other employees with sales figures comparable to those of Mr. Sampson who Integra placed on PIPs and terminated within the same general time period as Mr. Sampson.  (*See* Ex. A to Ellingstad Aff., Dkt. No. 28-1.)  Mr. Sampson has raised some issues with the validity of this showing, but, as explained below, his arguments do not have merit.  Thus, even assuming that Mr. Sampson had shown that other low performers were similar to him in the required ways, Integra has shown that those

_____

[5] In any event, the evidence shows that SM and MW were performing at a much higher level than Mr. Sampson, which makes them dissimilar to him.  Mr. Sampson has moved to strike Exhibit E to the affidavit of defendants' counsel, which sets out the sales data for August for Mr. Sampson and other employees including MW and SM.  This motion is moot because even without considering the August data, it is clear from the other records that MW's and SM's sales figures were significantly better than those of other members in Mr. Sampson's sales team.

employees were treated similarly to Mr. Sampson.

In another attempt to show disparate treatment, Mr. Sampson argues that Integra did not adhere to its policy of 70 ALEs per month with any other employee. He contends that Integra treated Mr. Sampson unfairly by imposing this quota on him. But Integra has shown that it did not strictly impose this quota on anyone, including Mr. Sampson. After Mr. Sampson did not sell 70 ALEs in September, October, and November he was not immediately terminated.

For all these reasons, Mr. Sampson has not offered facts supporting a finding that he was treated worse than similarly situated individuals not in a protected class. His claim for termination based on race therefore fails at the *prima facie* stage.

### C.    Mr. Sampson Has Not Shown Pretext.

Even if Mr. Sampson had met his initial burden, however, he fails on the remaining elements of his termination claim. As discussed further below, Integra has offered a legitimate, nondiscriminatory reason for its decision to terminate Mr. Sampson's employment, which is poor performance. In response, however, Mr. Sampson has not shown evidence from which a reasonable jury could conclude that this reason is a pretext for race discrimination.

As just mentioned, Integra has offered facts to support their assertion that Mr. Sampson's repeated failure to meet his sales quotas is what lead to his termination. "Poor performance is a quintessentially legitimate and nondiscriminatory reason for termination." *Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114, 1127 (10th Cir. 2005). The undisputed numbers back up Integra's assertion. Mr. Sampson did not once meet his sales quotas at either Eschelon or Integra, and his sales were at their worst prior to being placed on each PIP. Mr. Sampson's final and decisive PIP set forth sales numbers for December and other requirements. Mr. Sampson met his mid-month quota and was not terminated on December 15. Mr. Sampson did not meet

his end-of-the-month quota, however, and his employment was terminated at that time.

Mr. Sampson essentially concedes that Integra has met its burden of articulating a nondiscriminatory reason for his termination. The burden would then shift to Mr. Sampson to show a material facts suggesting that this reason is a pretext. Evidence of pretext may include, but is not limited to, facts tending to show that the proffered reason is false, procedural irregularities, the use of subjective criteria, or actions contrary to written company policies or practices. *See Kendrick*, 220 F.3d at 1230. A trier of fact may also use inferences properly drawn from a plaintiff's *prima facie* case to determine pretext. *Reeves* v. *Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000). Mr. Sampson attempts to show pretext through various means. As discussed below, none of these assertions have merit.

Mr. Sampson's first argument is that Integra's documentary evidence that other poor performers were placed on PIPs and terminated has several facial problems, showing that Integra is not being forthright with the court. For example, Mr. Sampson points out that to support its assertion that PIPs were issued to other employees with sales figures similar to Mr. Sampson's, Integra produced unsigned PIPs with no facial indication that they were delivered to the employees. Mr. Sampson also notes that some PIPs produced by Integra contain inconsistent dates and sales numbers. But Integra has offered proof that these inconsistencies are not attempts to misled the court or fabricate evidence, explaining the reason for each apparent issue raised by Mr. Sampson. In response to this proof, Mr. Sampson has presented no evidence to the contrary, instead arguing only that the court should assume that something improper has occurred. The court has no grounds to do so.

Further, Mr. Sampson again maintains that the asserted disparate treatment he received shows pretext. But as explained above, Mr. Sampson has not shown that he was similarly

situated to the group to which he compares himself.  Moreover, to the extent that the court would take it as true that Mr. Sampson's comparisons are valid, he has not offered proof disputing Integra's evidence that for the most part, employees with a similar record as Mr. Sampson's were treated similarly to him.

For these reasons, Mr. Sampson offers no evidence of pretext.  Because he has not met his *prima facie* case, and because has no evidence supporting a showing of pretext even if he had, Mr. Sampson's claim of race-based termination fails and summary judgment in Integra's favor is appropriate.

### III.  RETALIATION

A plaintiff may prove a retaliation claim in violation of Title VII and Section 1981[6] in one of two ways: the "mixed-motive" analysis, which requires evidence that retaliatory animus played a motivating part in the employment decision, or by application of the *McDonnell Douglass* burden-shifting framework.  *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1224-25 (10th Cir. 2008) (quotation omitted).  Mr. Sampson relies on both theories.  He argues that Mr. Arambula's statement to Mr. Sampson, "that his complaints will not be tolerated," is enough to meet either test, alone or in conjunction with other facts.  Under the "mixed-motive theory," Mr. Sampson argues the statement proves a retaliatory motive.  In the alternative, he argues that under the *McDonnell Douglas* burden-shifting analysis, this statement, along with the same facts Mr. Sampson alleges to show that Integra's proffered reason for terminating him in the context of his discrimination claim was pretextual, show that Integra's proffered reason for terminating Sampson was a pretext for retaliation.

---

[6] The Supreme Court has held that 42 U.S.C. § 1981 encompasses claims of retaliation. *CBOCS West Inc. v. Humphries*, __ U.S. __, 128 S. Ct 1951, 1958–60 (2008).

As explained above, Mr. Sampson has no offered evidence supporting a conclusion that Integra's nondiscriminatory reason for terminating Mr. Sampson was a pretext for race discrimination. Adding Mr. Arambula's comment does not change this outcome in the retaliation context. As explained below, once taken in context, it is clear that no reasonable jury would find that Mr. Arambula's statement is evidence of retaliatory intent.

Moreover, Mr. Sampson fails to establish a *prima facie* case of retaliation because, as discussed below, his belief that the subject-matter of his underlying complaints were protected by Title VII is unreasonable. *Robinson v. Cavalry Portfolio Servs., LLC,* 365 Fed. Appx 104, 113 (10th Cir. 2010) (unreasonable belief that complaints are covered by Title VII will not support retaliation claim). Mr. Sampson, therefore, did not have a reasonable good faith belief that he opposed a practice protected by Title VII. Accordingly, summary judgment is appropriate for Integra as to Sampson's retaliation claim.

### A.      Mixed-Motive Analysis.

In a mixed-motive case, a plaintiff may produce either direct or circumstantial evidence to show that a retaliatory motive directly relates to the question of discrimination in the particular employment decision at issue. *Fye*, 516 F.3d at 1226. Once the plaintiff presents evidence showing that retaliation played a motivating part in the employment decision, the burden shifts to the employer to prove that it would have taken the same action notwithstanding a retaliatory motive. *Id.* at 1225 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)). "A court that finds for a plaintiff under this standard has effectively concluded that an illegitimate motive was a 'but-for' cause of the employment decision." *Price Waterhouse*, 490 U.S. at 249. "Evidence of conduct or statements by persons involved in the decision making process may be viewed as directly reflecting the alleged [retaliatory] attitude" and will entitle the plaintiff to the

*Price Waterhouse* burden-shifting analysis. *Fye,* 516 F.3d 1226 (citation omitted).

Mr. Sampson argues that Mr. Arambula's statement, "your complaints are not going to be tolerated here," is direct evidence of a retaliatory motive on Mr. Arambula's part. Mr. Arambula made this statement shortly before he placed Mr. Sampson on the final PIP that was the basis for Mr. Sampson's termination. This statement alone, however, is quite dissimilar to evidence that the Tenth Circuit has previously held is sufficient to satisfy a plaintiff's burden of directly showing retaliatory motive. For instance, in *Thomas v. Denny's Inc.*, 111 F3d 1506 (10th Cir. 1997), decision makers involved in a plaintiff's promotion decision expressly stated that plaintiff would not be considered because he had complained of discrimination. 111 F.3d at 1512. The court held that these statements were direct evidence of a retaliatory motive. *See id.* In *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462 (10th Cir. 1992), the Tenth Circuit held that there was direct evidence of a retaliatory motive when 1) a supervisor admitted that he held plaintiff's EEOC filing against her, falsified her performance evaluations, and misrepresented incidents involving plaintiff, and 2) a manager testified that he relied on a misrepresented incident in his decision not to promote plaintiff. 979 F.2d at 1471 n.5.

Here, taken in context, "your complaints are not going to be tolerated," does not rise to the level of directly reflecting a retaliatory attitude. Unlike in *Thomas* and *Kenworthy,* Mr. Sampson recalls that after Mr. Arambula said "your complaints are not going to be tolerated," Mr. Arambula also said, "your performance is not where it needs to be, and things are not going to work out here." Mr. Sampson also concedes, however, that immediately before Mr. Arambula said, "your complaints will not be tolerated," Mr. Arambula said, "I'm disappointed to hear that. I will look into your concerns and make sure they will be handled appropriately."

As Mr. Sampson wants the fact finder to interpret these statements, Mr. Arambula was

making diametrically opposed statements, one right after the other. That is, Mr. Sampson argues that it could be found that immediately after promising to take Mr. Sampson's complaints seriously, Mr. Arambula threatened to exact revenge upon Mr. Sampson for making them. If a fact-finder understood this statement in that way, Mr. Sampson maintains, he or she could conclude that there was a retaliatory motive.

But another reading of Mr. Arambula's statement is possible. Specifically, "your complaints will not be tolerated" can be understood to mean that Mr. Arambula was telling Mr. Sampson that the subject matter about which he was complaining was intolerable. This reading of that statement is far more consistent with the previous statement that he would take the complaints seriously, in terms of logic and everyday experience. Moreover, this interpretation is supported by Integra's previous actions with respect to Mr. Sampson's complaints.

First, at the time Mr. Arambula offered Mr. Sampson a position with Integra after the merger, Mr. Arambula was already aware that Mr. Sampson had made complaints of discrimination at Eschelon. Mr. Sampson admits that he complained to Mr. Arambula and Mr. Nieboer about all of his prior concerns of harassment and discrimination at their first meeting in September—months before the final performance warning. Moreover, Mr. Arambula and Mr. Nieboer immediately involved human resources to try to address Mr. Sampson's concerns.

Given the context of the statements themselves, and Integra's prior actions, the court cannot credit Mr. Sampson's proffered interpretation as one which a reasonable jury would adopt. The statement accordingly is not competent evidence of retaliatory motive.

Assuming for the sake of argument that this statement did reflect a retaliatory motive, then the burden would shift to Integra to show that it would have still terminated Mr. Sampson. As already discussed in detail, the court concludes that Integra has made an unrebutted showing

that Mr. Sampson's performance was the reason that they terminated him. Integra has also shown that other employees who performed similarly were also terminated. Accordingly, Integra has shown that even if it were somehow motivated to fire Mr. Sampson because of his complaints, his poor performance was its overriding motivation.

### B.    McDonnell Douglas Framework.

If a plaintiff cannot show evidence directly reflecting retaliatory animus, he may invoke the three-part *McDonnell Douglas* framework to prove that the employer's proffered reason for its decision is a pretext for retaliation. *Fye*, 516 F.3d at 1227. Similar to a claim for discrimination, as mentioned above, Mr. Sampson must first establish a *prima facie* case of retaliation. *Id.* To do so, Mr. Sampson must offer proof that (1) he engaged in protected opposition to Title VII discrimination, (2) that a reasonable person would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action. *Id.* As explained below, Mr. Sampson fails to establish his *prima facie* case because he cannot demonstrate that he engaged in protected opposition to activities barred by Title VII.

### C.    Mr. Sampson's Belief That His Complaints Were Covered by Title VII was Unreasonable.

While working at Eschelon and Integra, Mr. Sampson complained about comments from co-workers and about co-workers and supervisors treating him in ways he believed were inappropriate. Mr. Sampson also complained to Integra HR and management that his complaints at Eschelon were not handled properly. Mr. Sampson asserts that these complaints were an activity protected by Title VII.

*Robinson* convinces the court that the subject matter about which Mr. Sampson

complained does not give rise to a reasonable good faith belief that Mr. Sampson's complaints are protected. In *Robinson*, the Tenth Circuit followed *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001). *See Robinson*, 365 Fed. Appx. at 113. In *Clark County*, a female employee brought a retaliation claim after she was transferred. The female employee had complained to her supervisor and two superintendents about sexual remarks made by her male supervisor and another male co-employee when they were reviewing psychological reports for job applicants. 532 U.S. at 269. In one applicant's report, the applicant had once commented to a co-worker, "I hear making love to you is like making love to the Grand Canyon." *Id.* "The supervisor read the comment aloud, looked at the female employee and said, 'I don't know what that means.' The other employee then said, 'Well I'll tell you later,' and both men chuckled." *Id.* The Court dismissed the female employee's retaliation claim because the employee had an unreasonable good-faith belief that the underlying conduct of which she was complaining violated Title VII. *Id.* at 271. The Court concluded that "no one could reasonably believe that the incident . . . violated Title VII." *Id.* at 270.

In *Robinson*, an employee, a Caucasian woman married to an African-American, complained to management about a co-worker's racial slurs. 365 Fed. Appx. at 108. The employee alleged that her co-worker was repeatedly using the "N" word while saying that he did not like the fact that black people can call each other the "N" word but that he could not call black people that. *Id.* The employee also stated that her co-worker made a comment, "that he didn't have black in his bloodline because if he did he would be scraping that sh_t off." *Id.* Subsequently, the employee brought a retaliation claim because she felt that she was subjected to an adverse employment action due to her complaints. *Id.* at 109. The *Robinson* court held that her retaliation claim would not stand because her belief that her complaints were about conduct

-24-

that violated Title VII was unreasonable. *Id.* at 113–14.

In *Robinson*, the Tenth Circuit distinguished *Crumpacker v. Kansas Dep't of Human Resources*, 338 F.3d 1163 (10th Cir. 2003). In *Crumpacker*, the court ruled that while an actual violation of Title VII is not required to maintain a retaliation claim, the employee must still have a reasonable good-faith belief that the underlying conduct or treatment being opposed violated Title VII. *Id.* at 1171.

Here, like the offensive but isolated comments in *Clark County*, and in *Robinson*, it is unreasonable to believe that the activities of which Mr. Sampson complained violated Title VII. Mr. Sampson complained about a handful of situations with co-workers during his time at Eschelon. While the court agrees that the term "Buckwheat" can reasonably be understood as derogatory, and "Niggers and Spicks" are undeniably derogatory, they are quite similar to the comments in *Clark County* and *Robinson* that did not rise to harassment under Title VII. During his time at Integra, Mr. Sampson complained to Integra management and HR about his past management and HR at Eschelon not properly handling his complaints mentioned above. Mr. Sampson also complained to Integra management about still hearing "Buckwheat" on occasion, but he acknowledges that the comment was infrequent and that he was not sure who said it. Finally, Mr. Sampson complained about co-workers making generally offensive comments, treating him inappropriately and ignoring him, but did not show how these other complaints related to his race.

Harassment is actionable under Title VII only if it so severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1326–27 (10th Cir. 2004). The Supreme Court has held that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not

amount to a Title VII violation.  *See Clark County*, 532 U.S. at 271.  "[C]omplaining about an isolated racial slur is not opposition protected by Title VII."  *Robinson*, 365 Fed. Appx. at 113-114 (citing *Jordan v. Alternative Res., Corp.*, 467 F.3d 378, 380 (4th Cir. 2006)).  At Integra, Mr. Sampson's complaints about other employees' actions did not rise to the level of severe or pervasive harassment under Title VII.  Aside from some boorish behavior unrelated to race, Mr. Sampson states that he occasionally heard an unidentified person say "Buckwheat."  A reasonable person could not conclude that those facts amounted to Title VII violations. Moreover, while at Integra, many of Mr. Sampson's complaints were that his past complaints at Eschelon were not handled appropriately.  Mr. Sampson, however, has not shown that a reasonable person would think that failing to account for a past employer's actions amounted to a Title VII violation.

In sum, Mr. Sampson's belief that his treatment at Integra violated Title VII is not reasonable.  Therefore, Mr. Sampson's complaints protected by Title VII and his *prima facie* case of retaliation fails.  Because the *prima facie* case fails, there is no need to go through the rest of the *McDonnell Douglas* analysis.

## CONCLUSION AND ORDER

For the reasons set forth above, Integra's motion for summary judgment (Dkt. No. 15) is GRANTED.

SO ORDERED this 6th day of December, 2010.

BY THE COURT:

_____
Clark Waddoups
United States District Judge